UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMIN BOOKER,

Plaintiff,

-against-

THOMAS GRIFFIN, et al.,

Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __02/23/2024__

No. 16 Civ. 00072 (NSR)

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge

Amin Booker ("Plaintiff") commenced this action against Thomas Griffin, Edward Demo, Paul Chappius, Gregory Keller, and Joseph Bellnier, ("Defendants"), asserting numerous claims, including that: (i) Defendants Griffin and Demo violated his First and Fourteenth Amendment rights by retaliating against him with a false Administrative Segregation ("Ad. Seg.") Recommendation because Plaintiff had made a number of complaints against Green Haven Correctional Facility ("Green Haven"), where he was then incarcerated; (ii) Defendants Chappius and Keller denied the Plaintiff due process in connection with the Ad. Seg. hearing in violation of the Fourteenth Amendment and the New York State Constitution; (iii) Defendants Bellnier and Keller failed to provide Plaintiff meaningful periodic reviews of the basis for his placement in Ad. Seg. in violation of the Fourteenth Amendment and the New York State Constitution; and (iv) the Defendants subjected Plaintiff to unconstitutional conditions of confinement in violation of the Eighth Amendment. (Third Amended Complaint ("Compl."), ECF No. 228.)

Presently before the Court are (1) Defendants' motion for summary judgment on all of Plaintiff's claims (ECF No. 279); and (2) Plaintiff's motion for partial summary judgment on his

Fourteenth Amendment claims in connection with the Ad. Seg. hearing and the periodic reviews regarding his placement in Ad. Seg. (ECF No. 289). Plaintiff additionally moves for summary judgment on Defendants' affirmative defenses of "failure to exhaust" and qualified immunity. (*Id.*)

For the following reasons, the Court GRANTS in part and DENIES in part Defendants' motion for summary judgment, and the Court GRANTS in part and DENIES in part Plaintiff's motion for partial summary judgment.

## BACKGROUND

### I.    Factual Background

The parties have submitted briefs, statements of material facts pursuant to Local Civil Rule 56.1, and the record and exhibits from discovery in the instant proceeding, which reflect the following factual background.

#### A. Plaintiff's Role on the ILC and Meeting with Defendant Griffin

In April 2015, Plaintiff was incarcerated at Green Haven. At Green Haven, Plaintiff served as an active member of the Inmate Liaison Committee ("ILC"), a group dedicated to recording and addressing inmates' concerns and grievances within the facility, as well as the Green Haven anti-gang program. (Plaintiff's Statement of Material Facts ("Pltf.'s 56.1") ¶ 1.) He also participated in the family reunion program, which requires inmates to be free of any "major, severe, chronic, or excessive disciplinary problems." (*Id.*)

In early April 2015, the ILC requested a meeting with the Department of Corrections and Community Supervision ("DOCCS") Commissioner Anthony Annucci to address inmate complaints of excessive and arbitrary beatings by prison staff. (Declaration of Amin Booker in Support of Motion for Summary Judgment ("Booker Decl."), ECF No. 297 ¶¶ 21-23.) On April

21, 2015, Plaintiff and Defendant Griffin, the Superintendent of Green Haven, met in the facility's package room. The parties dispute what occurred during this meeting. Plaintiff claims that Defendant Griffin pulled Plaintiff from his cell and cornered him in the facility's package room. (Pltf.'s 56.1 ¶ 18.) He then instructed Plaintiff to stop raising the topic of excessive and arbitrary beatings at ILC meeting and threatened him for "trying to go above [his] head and have [his] bosses come in [his] facility." (Booker Decl. ¶¶ 44-47.) Defendant Griffin then threatened to put Plaintiff in solitary confinement "with a push of a button," and promised that Plaintiff would be in solitary "for years." (Pltf.'s 56.1 ¶¶ 20, 34; Booker Decl. ¶ 49.)

The Defendants instead contend that Defendant Griffin interviewed Plaintiff about a rumored work stoppage demonstration (the "Demonstration") at Green Haven and whether he was currently affiliated with the Bloods gang (the "Bloods"). (Declaration of Thomas Griffin in Support of Motion for Summary Judgment ("Griffin Decl."), ECF No. 286, ¶ 22.) Plaintiff denied currently being a part of the Bloods, but did admit to past involvement with them. (*Id.*) Plaintiff also said he had heard about a planned demonstration and that if Defendant Griffin "let him go to the yard that night, he could Ad. Seg.t down the demonstration." (*Id.*) Based on this purported statement, Defendant Griffin concluded that Plaintiff had "significant influence and authority within the Bloods organization and could stop the demonstration." (*Id.*)

**B. Defendants' Investigation of the Rumored Demonstration**

The next day, on April 22, 2015, Plaintiff was transferred to Elmira Correctional Facility (Elmira") and placed into solitary confinement. (Pltf. 56.1 ¶¶ 35-38.) At the next Green Haven ILC meeting, additional complaints about inmate beatings were raised, and Defendant Griffin allegedly announced to the ILC Chair that he was "putting [Plaintiff] under [i.e., in the AD. SEG.] to be an example to anyone who has that bright idea again." *(Id.* ¶ 60.)

On the same day, Defendant Griffin contacted Defendant Joseph Bellnier, the Deputy Commissioner of DOCCS, to report a potential inmate demonstration at Green Haven. (Pltf.'s 56.1 ¶ 27.) Defendant Griffin was allegedly advised based on intelligence gathered from confidential informants that Plaintiff, among others, had been identified as a possible leader of the planned demonstration. (Griffin Decl. ¶ 20.) Defendant Bellnier immediately authorized an investigation into the demonstration. (*Id.* ¶¶ 27-29.) Defendant Edward Demo arrived as the lead investigator, and with Defendant Griffin, conducted interviews through the end of the night. (*Id.* ¶ 30.)

Defendant Griffin mentioned to Defendant Demo that he had interviewed the Plaintiff in the package room and that Plaintiff had allegedly told Griffin he could stop the demonstration. (Declaration of Edward Demo in Support of Motion for Summary Judgment ("Demo Decl."), ECF No. 285 ¶ 7.) Demo also interviewed Plaintiff, though the parties' accounts of the interview differ. Plaintiff claims that during the interview, Demo only asked Plaintiff about a use of excessive force incident involving an inmate named "Africa" that allegedly occurred in April 2015, and not about the alleged demonstration. (*See* Booker Decl. ¶¶ 58-62.) Defendants claim, however, that Plaintiff told Defendant Demo that he had spoken to Defendant Griffin earlier that day and he did not know about anything going on or why he was being interviewed. (Demo Decl. ¶ 9.)  He further stated that he heard that incarcerated individuals were being beat up that day and the day before but that he had nothing to do with it. (*Id.*) When Demo asked Plaintiff whether he thought there will be a problem at the facility, he said that nothing will happen. (*Id.*)

During the investigation, Defendant Demo never spoke to anyone who professed personal knowledge that Plaintiff was involved in the Demonstration or that he was involved with the Bloods—the group rumored to be involved with the Demonstration. (Pltf.'s 56.1 ¶¶ 30-32.) In

fact, inmates repeatedly named other inmates as being involved. (*Id.* ¶ 31.) Defendant Demo claims that, after the investigation, an unidentified inmate told him that other, also unidentified confidential informants ("CI") had suggested that Plaintiff could be involved in the Demonstration. (*Id.* ¶¶ 35.) Such CI intel was only ever given to Defendant Demo second-hand as he never met the CIs and did not investigate their motives, their reliability, or whether they had personal knowledge of Plaintiff. (*Id.* ¶¶ 35-36.)

On April 24, two days after Plaintiff was moved to the AD. SEG., Defendant Griffin wrote a memorandum to his brother, Assistant Commissioner Patrick Griffin, stating that he had interviewed Plaintiff on April 21 and concluded that Plaintiff "would pose a threat to safety and security of any facility he would be housed." (*Id.* ¶¶ 41-45.) To the memo, Defendant Griffin attached a open letter (the "Open Letter") purportedly circulated to prompt the Demonstration, but did not explain how he obtained it or how it was connected to Plaintiff. (*Id.* ¶ 55.) The Open Letter does not mention the Bloods, Plaintiff, or the word "demonstration." (*Id.* ¶ 24.) The Open Letter is typed in both Spanish and English. (*Id.* ¶ 25.)

The same day, after Plaintiff was already in solitary, Defendant Demo was subsequently directed to draft an Ad. Seg. Recommendation ("Recommendation") in part because of Defendant Griffin's conclusion that Plaintiff posed a threat. (*Id.* ¶¶ 49, 57.) Defendant Demo then contacted the gang unit of the New York City correctional department to seek information about Plaintiff. (*Id.* ¶ 46.)

The parties dispute whether the DOCCS records indicated gang involvement, as Plaintiff contends the computer system erroneously included expunged and incorrect charges. (*See, e.g.,* Declaration of Paul J. Kremer in Support of Plaintiff's Cross-Motion for Summary Judgment, ECF No. 296, Ex. 26.) Defendant Demo, however, concluded in his Recommendation that

Plaintiff had influence in the Bloods. (Pltf.'s 56.1 ¶¶ 50-51.) Defendant Demo admits that the only evidence he found tying Plaintiff to the Bloods was from the second- and third-hand inmate statements. (*Id.* ¶ 48.)

### C. The Ad. Seg. Hearing

Plaintiff was served with a copy of the Recommendation on or about April 25, 2015. (Defendants' Statement of Material Facts ("Defs.' Rule 56.1") ¶ 36.) The Recommendation is largely a recitation of Plaintiff's disciplinary record and allegedly expunged findings. (Pltf.'s 56.1 ¶ 50.) The Recommendation asserts that Plaintiff "had an inmate disseminate a letter to the inmate population" and that he "had the ability to organize inmates." (ECF No. 113-1 (copy of Recommendation).) It does not, however, identify any inmates or groups thereof influenced by Plaintiff or the time or place of any organizing activities. (*See id.*) The Recommendation concludes by saying that Plaintiff "has proven him self [sic] to be a severe management problem." (*Id.*) No other inmate was ever disciplined regarding the purported Demonstration. (Pltf.'s 56.1 ¶ 59.)

In May 2015, the Deputy Superintendent of Elmira Correctional Facility, Defendant Kirkpatrick, commenced a hearing against Plaintiff to determine whether he should be placed into Ad. Seg. (*Id.* ¶ 55.) At the hearing, Defendant Griffin testified first that Plaintiff was threatening inmates in the Green Haven yard within the week before his transfer to Ad. Seg. (*Id.* ¶¶ 63-65.) Before the hearing was concluded, however, Kirkpatrick was promoted to be Superintendent of Clinton Correctional Facility. (Defs.' 56.1 ¶ 38.) Because Defendant Kirkpatrick could no longer serve as the hearing officer, on June 30, 2015, Superintendent Chappius appointed Defendant Captain Gregory Keller to take his place. (*Id.*)

At the new hearing (the "Hearing") beginning July 7, 2025, the testimony given at the hearings before Defendant Kirkpatrick was thrown out. (*Id.*) At the outset of the hearing, Defendant Keller dismissed Plaintiff's argument that it was improper to start the hearing over, rather than continuing from where the first hearing ended. (*See* Declaration of Gregory Keller in Support of Defendants' Motion for Summary Judgment ("Keller Decl."), ECF No. 283 ¶ 14.) Defendant Keller informed Plaintiff instead that all the testimony would be retaken so that Defendant Keller could assess the evidence for himself.   (*Id.*; ECF No. 283-4 (Hearing Transcript) at 11-12, 17, and 20.)

A reading of the Recommendation was used as the notice of charges against Plaintiff. (Pltf.'s 56.1 ¶ 65.) Plaintiff was never shown the Open Letter. (*Id.* ¶ 22.) According to Plaintiff, without hearing the key allegations against him, he purportedly believed that Defendant Griffin's allegation lodged during the first hearing—that Plaintiff threatened inmates in the Green Haven yard—was still the main assertion against him in the Hearing before Defendant Keller. (*Id.* ¶ 81.) Accordingly, Plaintiff allegedly focused his defense on disproving that he threatened inmates in the yard. (*Id.*)

Plaintiff presented evidence and witnesses to show that Plaintiff was not in the yard during the time that Defendant Griffin claimed he was. (*See* ECF No. 296-2 (Hearing Transcript) at 109; ECF No. 296-37 (Hearing Determination Appeal Record) at 232-45.) For example, Plaintiff solicited questionnaires from inmates in his block and the adjacent cell block at Green Haven to verify that Plaintiff never asked nor threatened the inmates to refuse work or to not attend programs. (Pltf.'s 56.1 ¶ 79.) On July 21 and 22, eight witnesses, five of whom were inmates from Green Haven, testified in Plaintiff's defense. (ECF No. 296-2 at 88-96, 106-127, 134-142.) The inmates claimed that they were never approached by Plaintiff nor had heard of

him approaching anyone else to participate in the rumored Demonstration.) (*Id.* at 106-140; Pltf.'s 56.1 ¶ 83.)

During the Hearing, Defendant Keller denied some of Plaintiff's requests for documents and to call certain witnesses from DOCCS staff and inmates who were also alleged to have participated in planning the Demonstration. (*Id.* ¶ 72.) Defendant Keller also excluded a witness who could speak to Plaintiff's involvement in the anti-gang program at Green Haven on the basis that such witness was "irrelevant." (*Id.* ¶ 86.) Defendant Keller also frequently interrupted Plaintiff's questioning of witnesses to rephrase questions or strike questions. (*Id.* ¶¶ 67, 77, 86.) Defendant Keller alleges that this only occurred when he determined certain questions were inappropriate, such as those pertaining to testimony given at the first hearing before Defendant Griffin.  (Keller Decl. ¶ 17.)

Defendant Keller excluded Plaintiff from hearing the "confidential" testimony against him even though no CI testified or was identified at the Hearing. (Pltf.'s 56.1 ¶¶ 69-76.) The testimony in question relayed that an unspecified number of unidentified CIs linked Plaintiff to the Demonstration, (*id.* ¶ 71), and that a high-ranking Blood member in another facility stated that if anything happened in Green Haven, Plaintiff "would have something to do with it." (ECF No. 296-2 at 328.) Defendant Keller did not speak to any of the CI sources' himself. (Pltf.'s 56.1 ¶¶ 70-73.)

Defendant Keller reached a disposition on August 21, 2015, agreeing with Defendant Demo's recommendation and sentencing Plaintiff to indefinite placement in Ad. Seg. (*Id.* ¶ 74.) Plaintiff voiced concern about potential due process violations in the Hearing to Defendant Chappius, Superintendent at Elmira, but Chappius took no action in response to Plaintiff's complaints. (*Id.* ¶ 82.) Plaintiff then appealed the disposition of the Hearing to the DOCCS

Director of Special Housing, Donald Venettozzi, who affirmed the disposition on November 6, 2015. (*Id.* ¶ 83.)

### D. Periodic Reviews and Plaintiff's Conditions in Ad. Seg.

After his conviction, under DOCCS regulations, Plaintiff was entitled to a three-tiered review of his solitary confinement every 60 days (a period that was shortened to 30 days in December 2020). (*Id.* ¶¶ 149-50.) Defendant Keller personally authored and approved some of Plaintiff's initial Level One reviews, and Defendant Bellnier, as the Level Three reviewer, approved the reviews. (*Id*. ¶¶ 151, 156-67.)

While in solitary, Plaintiff filed multiple grievances about his conditions of confinement, which were responded to, though not, in Plaintiff's version of events, adequately addressed. (Defs.' Rule 56.1 ¶ 59; Pltf.'s 56.1 ¶ 142.) For example, Plaintiff claims that he suffered sleep deprivation because of his placement in cells next to inmates who were suffering from psychological or mental illnesses; the inmates created a persistent, deafening clamor that kept Plaintiff awake at night. (Pltf.'s 56.1 ¶ 136.) These inmates also started fires, urinated in their cells, and threw feces at Plaintiff, which left a pervasive smell in his block and cell. (*Id.*) Plaintiff's cell also allegedly suffered from infestations of cockroaches and other insects on several occasions during his confinement. (*Id.* ¶¶ 127-131.)

On or about March 19, 2020, Plaintiff was transferred to Attica Correctional Facility. (Defs.' Rule 56.1 ¶ 60.) On or about December 22, 2020, Plaintiff began the process of transitioning from Ad. Seg. to a step-down program. (*Id.* ¶ 61.) As a result, Plaintiff was no longer entitled to periodic reviews pursuant. (*Id*.) On or about January 7, 2021, Plaintiff was transferred to Midstate Correctional Facility where he was placed into another step-down program as the first step toward transitioning back into the general population. (*Id.* ¶ 62.) On or

about November 5, 2021, Plaintiff transferred to Five Points Correctional Facility where he was placed into general population. (*Id.* ¶ 63.) Plaintiff ultimately remained in Ad. Seg. for more than six and a half years.

## II.   Procedural History

On January 4, 2016, Plaintiff commenced the present action pursuant to 42 U.S.C. § 1983, alleging, inter alia, various violations of his First, Eighth, and Fourteenth Amendment rights by officials at Green Haven and Elmira. (ECF No. 2.) Defendants filed a motion to dismiss Plaintiff's complaint on January 06, 2017. (ECF No. 46.) Plaintiff opposed Defendants' motion to dismiss and filed a cross-motion for summary judgment on his due process claims. (ECF No. 52.) The Court granted the Defendants' motion to dismiss in part and denied in part, and denied Plaintiff's cross-motion for summary judgment. (ECF No. 80.)

On March 17, 2021, Plaintiff filed the operative complaint. (ECF No. 228.) Defendants filed a motion for summary judgment on all remaining claims (ECF No. 279) and a memorandum of law in support thereof ("Defs.' MOL", ECF No. 280). In response, Plaintiff opposed Defendants' motion for summary judgment. ("Pltf.'s Opp.", ECF No. 300.) Plaintiff also filed a cross-motion for partial summary judgment on his Fourteenth Amendment due process claims, as well as Defendants' affirmative defenses of "failure to exhaust" and qualified immunity (ECF No. 289), as well a memorandum of law in support thereof ("Pltf.'s MOL", ECF No. 290). Defendants filed a reply in further support of their motion for summary judgment as well as an opposition to Plaintiff's cross-motion for partial summary judgment. ("Defs.' Reply", ECF No. 292.) Plaintiff also filed a reply in further support of his cross-motion for partial summary judgment. ("Pltf.'s Reply", ECF No. 302.)

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 56(c), summary judgment must be granted if "there is no genuine issue of material fact and ... the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 n. 4 (1986). "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir. 1999) (internal quotations and citations omitted). In order to prove that a genuine issue of material fact exists, a plaintiff "may not rest upon the mere allegations or denials of the pleading[s]," but must by affidavit or otherwise "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "Conclusory statements, conjecture or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).

Courts must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). The moving party bears the initial burden of demonstrating an absence of genuine issues of material fact. *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). If the initial burden is met, the non-moving party "must produce specific facts indicating that a genuine issue of fact exists. If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (internal quotations and citations omitted) (alteration in original).

The same standard of review applies when the Court is faced with cross-motions for summary judgment, as here. *See Lauria v. Heffernan*, 607 F. Supp. 2d 403, 407 (E.D.N.Y. 2009) (citations omitted). When evaluating cross-motions for summary judgment, the Court reviews each party's motion on its own merits, and draws all reasonable inferences against the party whose motion is under consideration. *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

## DISCUSSION

### I.      Fourteenth Amendment Due Process Claims

The Fourteenth Amendment to the Constitution provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004). Plaintiff's confinement, which includes both his initial placement in administrative segregation following the Ad. Seg. Hearing and his continuous placement there for six years – is an example of such hardship.

To present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process. *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017). This is the relevant test for both of the Fourteenth Amendment due process claims Plaintiff asserts. The Court considers each claim in turn.

Ad. Seg. Hearing

Plaintiff alleges that his right to due process was violated during the Hearing because: (1) he received insufficient notice of the allegations against him; (2) he was deprived of a reasonable ability to call witnesses and present a defense; (3) the Hearing was overseen by an allegedly biased hearing officer who predetermined Plaintiff's guilt; and (4) the Hearing disposition entirely lacked in reliable evidence. (Pltf.'s MOL at 9.) Defendants argue that Plaintiff is mistaken as to each of these allegations and the evidence demonstrates that his due process rights were not violated. (Defs.' MOL at 17.) Plaintiff, however, contends that there is no dispute that Defendants Chappius and Keller failed to provide Plaintiff due process in connection with the Hearing. (Pltf.'s MOL at 8.) Accordingly, both parties move for summary judgment on this claim.

This Court has already held that Plaintiff had a liberty interest based on the length of his confinement, satisfying the first element of the *Proctor* test. (*See* ECF No. 80.)

As to the second element of the *Proctor* test – namely, whether Defendants deprived Plaintiff of his liberty interest in violation of due process – due process dictates that, in connection with a disciplinary hearing, "an inmate is entitled to [1] advance written notice of the charges against him; [2] a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; [3] a fair and impartial hearing officer, and [4] a written statement of the disposition; including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira*, 380 F.3d at 69.

The notice requirement of due process does not demand "notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct." *Id.* at 72. It does, however, require notice with "sufficient factual specificity to permit a reasonable person to

understand what conduct is at issue so that he may identify relevant evidence and present a defense." *Id.* Accordingly, a vague notice that does not clearly delineate "the evidence upon which a discipline ruling is based" and afford an inmate the "reasonable opportunity to explain his actions and to alert officials to possible defects in the evidence" is constitutionally deficient. *See id.* at 71. For example, in *Sira,* an inmate was charged with urging, organizing, and threatening other inmates to participate in a work stoppage demonstration. *Id.* at 62. The misbehavior report received by the inmate in advance of his hearing, however, "provide[d] no notice as to the specific site or sites of his misconduct; it [did] not indicate the words or actions [the inmate] employed in purportedly urging, organizing, or threatening inmates to participate in the Y2K strike; and it identifie[d] no inmates toward whom his actions were directed." *Id.* at 71. The Second Circuit accordingly found that the inmate had "presented a viable due process claim of               inadequate               notice."               *Id.*               at               72.

Likewise, in *Taylor v. Rodriguez,* the Second Circuit rejected as "vague or conclusory" a notice that informed an inmate that he was being considered for special confinement based on past acknowledged membership in the "Latin Kings" gang, "recent tension in B–Unit involving gang activity," and unspecified "statements by independent confidential informants." 238 F.3d 188, 193 (2d Cir. 2001). Such notice left the inmate "hav[ing] to guess what conduct forms the basis for the charges against him," and therefore "was too vague to allow [the inmate] to prepare an adequate defense," in violation of due process. *Id.*

Here, the notice received by Plaintiff – namely, the Recommendation – was similarly constitutionally deficient. The Recommendation contains reference to Plaintiff's past gang-related activity, his alleged concession to Defendant Griffin that he carried significant influence and authority in the Bloods, and a recitation of his history of organizing prison demonstrations.

The activity with which Plaintiff was presently being charged—organizing an impending demonstration against the Green Haven administration—however, is not outlined with any specificity in the Recommendation. Setting aside the lengthy recitation of Plaintiff's disciplinary history and Plaintiff's purported confession to Defendant Griffin that he was once a member of the Bloods and "could shut down the demonstration" (a disputed fact that the Court will not consider in resolving cross-motions for summary judgment), the Recommendation contains only one specific allegation: that at some unspecified date, time, and place within Green Haven, Plaintiff "had an inmate disseminate a letter to the inmate population for a call to inmates for 'Solidarity.'" (*See* ECF No. 113-1.) This sole allegation, however, does not identify when or where Plaintiff allegedly engaged in misconduct, leaving him unable to determine "whether his conduct allegedly occurred on a specific day in . . . or over the course of several weeks; and whether he had to defend against misconduct in the mess, the prison yard, his cell block, or some other location." *Sira*, 380 F.3d at 71-72. A notice which lacks reference to date, time, and place of accused misconduct is plainly insufficient. *Cf. Williams v. Korines*, 966 F.3d 133, 144 (2d Cir. 2020) (holding that misbehavior report which contained "the names of the guards who conducted the search, the date and time of the search, and an explanation that the guards determined that sixteen of [inmate's] photographs depicted hand signs that were associated with the Crips" constituted adequate notice).

In addition, the Recommendation does not identify any specific words or actions that connect Plaintiff with the Open Letter he allegedly had disseminated, nor does it identify any specific inmates Plaintiff was allegedly trying to organize. This type of notice impermissibly leaves a defendant guessing what conduct of his was at issue. *Cf. Samuels v. Selsky*, 166 F. App'x 552, 554 (2d Cir. 2006) (finding that a misbehavior report that advised an inmate of the date,

time, and place of the alleged misbehavior, as well as the conduct at issue satisfied due process). In fact, the record indicates that Plaintiff positively misunderstood the charges against him, and instead believed that he was being accused of intimidating inmates in the Green Haven yard and therefore presented evidence to that end. (*See* Pltf.'s 56.1 ¶ 63; *see also Taylor,* 238 F.3d at 193 ("we have no doubt that plaintiff misunderstood what charges were leveled against him. For example, the plaintiff testified, and introduced witness testimony, on matters concerning a wholly unrelated disciplinary incident.").)

Under the standard applied by the Second Circuit in *Sira* and *Taylor*, the notice supplied by the Recommendation was plainly insufficient. As drafted, the Recommendation did not permit Plaintiff to adequately present a defense. Where, as here, "a defendant is provided with no specific facts relating to conclusory charges that he violated prison rules prohibiting inmates from urging or threatening others to cause prison disruptions, he has no more ability to identify the conduct at issue and to muster a defense than if he had been given no notice at all." *Sira*, 380 F.3d at 72 (2d Cir. 2004).

Accordingly, the Court holds that Plaintiff was denied due process in connection with the Ad. Seg. hearing because he did not receive adequate written notice of the charges against him. Because the contents of the Recommendation are not in dispute, the Court awards summary judgment on this issue in Plaintiff's favor.

<u>Periodic Reviews</u>

Plaintiff asserts that his due process rights were violated by Defendants Keller, Chappius, and Bellnier because they failed to provide him with meaningful periodic reviews of his Ad. Seg. status, which lead to his continued placement on Ad. Seg. (Pltf.'s MOL at 19.) Defendants

disagree, arguing that Plaintiff received sufficient process in connection with his reviews. (Defs.' MOL at 24.) Both parties move for summary judgment on this claim.

The Second Circuit has recognized the due process right to be free from pretextual administrative confinement. *Soto v. Walker*, 44 F.3d 169, 173 n.4 (2d Cir. 1995); *see also Pusepa v. Annucci*, No. 17-CV-1765 (RA), 2019 WL 690678, at *12 (S.D.N.Y. Feb. 19, 2019 ("A 'pretextual' administrative confinement may be raised as a separate constitutional violation.") (quoting *Proctor v. Kelly*, No. 05-CV-0692, 2008 WL 5243925, at *12 (N.D.N.Y. Dec. 16, 2008)). To comport with due process, the placement of an inmate in Ad. Seg. "must be periodically reviewed to ensure that it 'is not used as a pretext for indefinite confinement.'" *Colon v. Annucci*, No. 17-CV-04445 (PMH), 2021 WL 3774115, at *7 (S.D.N.Y. Aug. 24, 2021) (quoting *Zimmerman v. Seyfert*, No. 03-CV-01389, 2007 WL 2080517, at *19 (N.D.N.Y. July 19, 2007)). As with Plaintiff's due process claim in connection with the Hearing, because the Court has already found that Plaintiff had a liberty interest in being free from confinement (*see* ECF No. 80), the sole issue before the Court on this claim is whether Defendants afforded Plaintiff sufficient process.

When an inmate is confined to Ad. Seg., due process requires that prison officials periodically review the confinement to ensure that the state's justification for the confinement "has not grown stale and that prison officials are not using Ad. Seg. as 'a pretext for indefinite confinement of an inmate.'" *Proctor*, 846 F.3d at 609 (citation omitted). In other words, "a prisoner who is confined to administrative segregation for an extended period of time must receive 'some sort of periodic review' to verify that they 'remain[] a security risk'." *Hewitt v. Helms*, 459 U.S. 460, 4777 n.9 (1983). Under the relevant regulations, Defendants Bellnier and Keller were required to give Plaintiff a meaningful review of his solitary confinement every 60

days (later shortened to every 30 days). N.Y. Comp. Codes R. & Regs. tit. 7, § 301.4(d) (2015 version); N.Y. Comp. Codes R. & Regs. tit. 7, § 301.4(c) (2020 version). The periodic reviews were to consist of three levels of review: first, by a committee of three officials from the facility where Plaintiff was housed (the "Facility Committee"), which in some instances included Defendant Keller; next, by a committee of three officials from the DOCCS central office in Albany (the "Central Office Committee"); and finally, by the Deputy Commissioner for Correctional Facilities – in this case, Defendant Bellnier. (Pltf.'s 56.1 ¶¶ 149-51, 158.)

The Second Circuit requires that prison officials satisfy three criteria when conducting periodic reviews: the officials must (1) "actually evaluate whether the continued confinement is justified rather than [being] guided by a preordained outcome"; (2) "evaluate whether the justification [for Ad. Seg.] exists at the time of review or will exist in the future"; and (3) advance the purpose of "maintaining institutional safety and security or another valid reason rather than the desire to impose punishment on the inmate." *H'Shaka v. O'Gorman*, 444 F. Supp. 3d 355, 372 (N.D.N.Y. 2020) (citing *Proctor*, 846 F.3d at 610-11). "Procedural due process does not permit a court to review the substance of DOCCS's decision to confine a defendant in Ad. Seg.…The Due Process Clause permits only an evaluation of whether Defendants' *method* for coming to their Ad. Seg. determinations is sufficient." *H'Shaka v. O'Gorman*, 758 Fed. Appx. 196, 199 (2d Cir. 2019) (internal citations omitted) (emphasis added). Furthermore, regarding method, "[t]he periodic review can be informal and non-adversarial. These reviews do not require the presence of the accused and do not require the reviewer to 'always consider new information, since the original reasons for placing the inmate in [Ad. Seg.] may continue to be compelling.'" *Giano v. Selsky*, No. 91 Civ. 166, 2002 WL 31002803, at *7 (N.D.N.Y. Sept. 5, 2002) (internal quotation marks and citation omitted). Finally, failing to satisfy even one of the

Second Circuit's three criteria for periodic reviews, *H'Shaka*, 444 F. Supp. 3d at 372, constitutes a due process violation, *Proctor*, 846 F.3d at 610.

The Court finds that Plaintiff has raised triable question of fact as to whether Defendants' periodic reviews were constitutionally meaningful. In particular, a reasonable fact finder could conclude that Defendants conducted their reviews by going through the procedural motions guided by a preordained outcome, thereby failing to satisfy the first *Proctor* factor requiring prison officials to "actually evaluate whether the continued confinement is justified." *H'Shaka*, 444 F. Supp. at 372. For example, for several extended periods of time, "the first and third paragraphs of the Facility Committee's reviews were copied and pasted verbatim," and "[t]he reviews are replete with identical typos." (Pltf.'s Reply at 8, n. 4, 5.) These nearly identical reviews may be indicative of a sham review process and "suggest to a reasonable jury that [Plaintiff's] reviewers treated the process as satisfied by boilerplate explanations instead of a forthright review." *Proctor*, 846 F.3d at 613. Additionally troubling is Defendant Bellnier's admission that at his level of review, he would not consult Plaintiff's previous reviews as reference points, (ECF No. 296-54 at 149:12-15), and relied completely on the information given to him by the Facility and Central Office Committees, (*id.* at 213:10-15), because he believed that he was not required to conduct independent investigations of people that were "assigned to do the work for me," (*id.* at 237). As a result, "DOCCS officials' own statements raise serious doubts about whether they have conducted [the Plaintiff's] periodic reviews with the outcomes pre-ordained" and "may raise questions in a reasonable jury's mind about whether that process has been meaningful as it relates to [Plaintiff]." *Proctor*, 846 F.3d at 612.

The Court also questions whether Defendants violated the second *Proctor* factor, which required them to genuinely evaluate whether the justification for Plaintiff's continued placement

in Ad. Seg. existed at the time of each review or would exist in the future. The main explanation repeated throughout reviews for why Plaintiff should remain in Ad. Seg. was because "[h]e has a charismatic personality that he uses this [*sic*] to manipulate others, particular other inmates." (*See* ECF No. 303-1 at 643, 650, 653, 656, 659, 663.) The Second Circuit has explained, however, that "[r]eviews must take into account prison conditions and inmate behavior as they *change* over time." *Proctor*, 846 F.3d at 611 (emphasis added). Focusing on an immutable trait like an inmate's personality undermines the purpose of this review, which is to track changes which "may modify the calculus of whether the inmate presents a current threat to the safety of the facility." *Id.* The Court notes that even consistent praise throughout 2018 and 2019 by the Central Review Committee that Plaintiff was cordial with staff (ECF No. 303-1 at 626), polite and respectful (*id.* at 650), and displayed appropriate behavior and attitude (*id.* at 666, 672, 695) did not "modify the calculus" of whether Plaintiff posed a threat. His charismatic personality instead served as an apparently iron-clad justification for indefinite confinement.

Finally, a reasonable fact finder could also find that Defendants violated the third *Proctor* factor, which requires that an inmate's continued placement in Ad. Seg. advance the purpose of "maintaining institutional safety and security or another valid reason rather than the desire to impose punishment on the inmate." *Proctor*, 846 F.3d at 610-11. Plaintiff's reviews repeatedly reference his past indiscretions, even though these incidents were all remote in time and had no apparent connection to his behavior in Ad. Seg. (*See, e.g.* ECF No. 303-2 at 672, 674, 677, 681, 684.) Conversely, Plaintiff's good behavior while in Ad. Seg. did not appear to move the needle, so to speak, on Defendants' evaluation of his continued confinement. (*See, e.g.* 303-1 at 626, 650, 666, 672, 695.) Defendant Bellnier even specifically admitted that he had no process for determining when the information contained within Plaintiff's reviews became stale, (Pltf.'s 56.1

¶ 164 (when asked "When would information become stale or too old to include in future reviews?" he replied "I have no way of answering that question.")), nor did he read previous reviews to track any positive trends in Plaintiff's behavior, (ECF No. 296-54 at 149:15).

The Court is therefore "troubled by the complete absence of any meaningful indication by DOCCS of when and under what circumstances Plaintiff might be released from Ad. Seg." *See H'Shaka*, 444 F. Supp. 3d at 374. The Second Circuit has made clear that "[t]he state may not use Ad. Seg. as a charade in the name of prison security to mask indefinite punishment for past transgressions." *Proctor*, 846 F.3d at 611. "Based on the current record, a reasonable fact finder could conclude that Defendants used Plaintiff's remote violent conduct prior to being placed in Ad. Seg. (and his sporadic, relatively minor non-violent incidents while in Ad. Seg.) as a pretext for their desire to keep him in Ad. Seg. in order to punish him for past conduct," in violation of the third *Proctor* factor. *H'Shaka*, 444 F. Supp. 3d at 374. A reasonable jury may conclude that the Defendants "use[d] past events alone to justify indefinite confinement" in violation of due process. *Proctor*, 846 F.3d at 611.

"It is important to recognize that not all of the evidence points in favor of [Plaintiff]. Some of the evidence could lead a reasonable jury to conclude, as Defendants urge, that DOCCS officials have analyzed Plaintiff's good behavior in their section 301.4(d) reviews and 'found it to be outweighed by other facts.'" *Id.* at 614 (citation omitted). The reviews and evidence proffered by Defendants suggests that there were times when Plaintiff followed the rules, and there were other times when he committed infractions and received inmate misbehavior reports, undermining his record of good behavior. (*See* ECF No. 287-3 at 612-614.) Moreover, Defendants dispute Plaintiff's contention that Defendant Keller coerced another committee member to blindly sign off on continuing Plaintiff's Ad. Seg. without properly reviewing the

information, and whether Bellnier merely rubber-stamped the recommendations from his subordinates. (*See* Defs.' Reply at 23.) A reasonable jury may still conclude that DOCCS officials had a methodical approach to conducting periodic Ad. Seg. reviews. Because of these factual disputes, the Court cannot grant Plaintiff summary judgment on this claim.

Likewise, however, the Court cannot grant Defendants summary judgment on this claim either. Given all the admissible evidence of Defendants' statements and Plaintiff's disciplinary history, there is a genuine dispute of material fact regarding whether Defendants engaged in a meaningful review of Plaintiff's continued Ad. Seg. status. Plaintiff has presented triable factual questions as to whether his reviews have been constitutionally meaningful. On that basis, the Court denies both parties' motion for summary judgment as to this claim.

## II.     Qualified Immunity

Defendants argue they are entitled to qualified immunity with respect to Plaintiff's claim that his rights under the First, Eighth, and Fourteenth Amendments were violated. (Defs.' MOL at 29.) Plaintiff, by contrast, argues that Defendants cannot meet the high bar for proving the affirmative defense of qualified immunity, and therefore the Court should grant summary judgment for him on this issue. (Pltf.'s Opp. at 23.)

The Court can afford a defendant summary judgment as to qualified immunity if the Court finds: "[1] the asserted rights were not clearly established, or [2] if the evidence is such that, even when it is viewed in the light most favorable to the plaintiff[] and with all permissible inferences drawn in [his] favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right." *Williams v. Greifinger*, 97 F.3d 699, 703 (2d Cir. 1996) (citations omitted). If the asserted right was clearly established, however, then "the immunity defense

ordinarily should fail, since a reasonably competent public official should know the law governing his conduct," with the exception "if the official pleading the defense…can prove that he neither knew nor should have known of the relevant legal standard." *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982). This exception is known as the extraordinary circumstances exception because it requires "extraordinary circumstances…and is generally predicated upon the defendant relying upon advice of legal counsel." *Walker v. Schult*, 463 F. Supp. 3d 323, 338 (N.D.N.Y. 2020), *rev'd and remanded on other grounds*, 45 F.4th 598 (2d Cir. 2022). For this reason, the extraordinary circumstances exception "applies only rarely." *Id.* (quoting *Wyo., Dep't of Envtl. Quality*, 902 F.2d 1482, 1488 (10th Cir. 1990)).

As an initial matter, Plaintiff's rights were clearly established by 2015. The Court has previously found that "[t]here is no question" that Plaintiff's First Amendment rights "were clearly established at the time of Defendants' alleged retaliation." (*See* ECF No. 80 at 26.) Likewise, it is well-established that prison inmates have a right to due process at prison disciplinary hearings, *Sira*, 380 F.3d at 69, and through Ad. Seg. reviews, *Proctor*, 846 F.3d at 608. The right to be free from inhumane and unjustified solitary confinement was also clearly established by 2015. *H'Shaka*, 444 F. Supp. 3d at 390 ("[T]he Supreme Court indicated in 2002 (well before [p]laintiff was placed in Ad. Seg.) that the Eighth Amendment is violated by conditions that are totally without penological justification.") Accordingly, the First, Eighth, and Fourteenth Amendment rights asserted by Plaintiff were clearly established before the events at issue.

Because the relevant law was clearly established, Defendants are not entitled to a qualified immunity defense. *See Harlow*, 457 U.S. at 818–19. "Prison officials are charged with knowledge of relevant decisional law, especially the decisions of the circuit in which they

perform their official duties." *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989). The law in this Circuit was clear. In fact, the law of qualified immunity does not even "require a case on point concerning the exact permutation of facts that state actors confront in order to establish a clear standard for their behavior," and yet *Sira, Proctor,* and *H'Shaka* share factual similarities (and, in the case of *Proctor*, even the same defendant) as this case, such that Defendants should have been aware of Second Circuit case law that had clearly established the rights advanced by the Plaintiff. *See Hancock v. County of Rensselaer*, 882 F.3d 58, 69 (2d Cir. 2018).

Because Defendants are charged with knowledge of the law, the Court disagrees with the Defendants' contention that it was objectively reasonable for them to believe that their actions did not violate clearly established law. The Defendants contend that "Griffin and Demo were justified in investigating the impending II demonstration due to the extreme security risk it would create for the facility." (Defs. MOL at 30.) But, for the purposes of a qualified immunity analysis, it does not matter if investigating a rumored prisoner demonstration was "justified." Rather, Defendants should have been aware that investigating an inmate as pretext to retaliate against the inmate for exercising his First Amendment rights was not justified. (*See* ECF No. 80 at 26.) Likewise, Defendants claim that Keller and Bellnier, respectively, acted reasonably in conducting the Hearing and reviewing the periodic reviews because they acted in accordance with DOCCS rules and regulations. But "the fact that there may have been a policy that promoted or allowed [unlawful] conditions does not constitute [the] exceptional circumstances" required to sustain a defense of qualified immunity. *Walker*, 463 F. Supp. 3d at 338 (citation omitted). Finally, Defendants have also not established extraordinary circumstances based on reliance on the advice of counsel. *See id.*

Accordingly, Defendants cannot rely on the defense of qualified immunity against Plaintiff's claims. The Court therefore awards the Plaintiff summary judgment on this issue.

### III.   Exhaustion

In their answer to the operative complaint, Defendants asserted the defense of exhaustion, contending that Plaintiff "may have failed to exhaust his available administrative remedies as to some or all of his claims." (ECF No. 220 ¶ 151.) Plaintiff moves for summary judgment on this defense on the grounds that Defendants cannot produce any evidence that Plaintiff failed to administratively exhaust any of his claims. (Pltf.'s MOL at 24.)

The Defendants failed to respond to Plaintiff's arguments concerning the defense of exhaustion in their opposition papers. "[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition [to summary judgment] that relevant claims or defenses that are not defended have been abandoned." *Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014); *see also Spagnuolo v. Howell*, 814 F. App'x 614, 618–19 (2d Cir. 2020) (affirming trial court's dismissal at summary judgment of a party's claims based on the party's failing to respond to the opposition's argument for their dismissal).

Accordingly, the Court finds that Defendants have abandoned the defense of exhaustion and awards Plaintiff summary judgment on this issue.

### IV.   Unconstitutional Conditions of Confinement

Defendants seek summary judgment on Plaintiff's claim that Defendants Keller, Chappius, and Bellnier violated his Eighth Amendment rights by subjecting him to more than six years of solitary confinement without any legitimate penological justification. (Defs.' MOL at 19.) Plaintiff opposes and argues that he "has adduced evidence sufficient to support both of the findings necessary for this claim," and therefore defeat summary judgment. (Pltf.'s Opp. at 7.)

The Supreme Court has held that "[c]onfinement in a prison or in an isolation cell," such as Ad. Seg., "is a form of punishment subject to scrutiny under Eighth Amendment standards."

*Hutto v. Finney,* 437 U.S. 678, 685 (1978). "The conditions of special housing units," however, "do not per se constitute cruel and unusual punishment in violation of the Eighth Amendment." *Dixon v. Goord*, 224 F. Supp. 2d 739, 748 (S.D.N.Y. 2002) (citing *Anderson v. Coughlin,* 757 F.2d 33 (2d Cir. 1985)); *see also Madison v. Crowley*, No. 19-CV-6554 FPG, 2020 WL 2542636, at *13 (W.D.N.Y. May 19, 2020) ("Generally speaking, confining an inmate in SHU [special housing units], without more, and notwithstanding the restrictions that such confinement imposes on inmate life, does not constitute cruel and unusual punishment.") Rather, "whether incarceration in the SHU violates the Eighth Amendment…depends on the duration and conditions of the confinement." *Gonzalez v. Hasty*, 802 F.3d 212, 224 (2d Cir. 2015). In order to establish an Eighth Amendment violation, an inmate must demonstrate that (1) the conditions of his confinement in Ad. Seg. "result[ed] in unquestioned and serious deprivations of basic human needs such that the conditions pose[d] an unreasonable risk of serious damage to his health" (the "Objective Test"); and (2) "the defendants imposed the conditions with deliberate indifference, meaning that the defendants knew of, and disregarded, an excessive risk to the plaintiff's health or safety" (the "Subjective Test"). *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013); *Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996).

Regarding the Objective Test, to defeat summary judgment, the undisputed facts on the record must show "objectively, sufficiently, serious...denial of the minimal civilized measure of life's necessities." *Willey v. Kirkpatrick*, 801 F.3d 51, 66 (2d Cir. 2015). The Objective Test can be satisfied based on the length of the confinement, such that the effects are "grossly disproportionate" to the reasons for the isolation. *Peoples v. Fischer*, 898 F. Supp. 2d 618, 621 (S.D.N.Y. 2012) ("Numerous courts have found that long stretches of segregation can constitute cruel and unusual punishment."); *H'Shaka*, 444 F. Supp. 3d at 379 (finding the discrepancy

between length of time in solitary confinement and severity of infractions raises a genuine question of fact under Objective Test). As for the Subjective Test, keeping an inmate in solitary confinement without sufficient "penological justification" can alone demonstrate deliberate indifference. *H'Shaka*, 444 F. Supp. 3d at 380. This is in part because of "the fact that the risk of harm is obvious" when an inmate is kept in solitary confinement for extended periods of time. *Hope v. Pelzer*, 536 U.S. 730, 738 (2002); *see also Davis v. Ayala*, 135 S.Ct. 2187, 2210 (2015) ("But research still confirms what this Court suggested over a century ago: Years on end of near-total isolation exact a terrible price," including common side effects of anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors); *Peoples v. Annucci*, 180 F. Supp. 3d 294, 299 (S.D.N.Y. 2016) ("the deleterious effects of isolated housing on inmates—especially to those assigned to long-term solitary confinement—are well-known and amply documented," including the fact that prolonged solitary confinement "can and does lead to significant psychological harm").

Here, Plaintiff was held for over six years in solitary confinement because of his alleged attempt to organize a prisoner demonstration and his "charismatic personality." (*See* ECF No. 303-1 at 643, 650, 653, 656, 659, 663.) DOCCS's own guidelines, however, recommend limiting "keeplock admission", such as Ad. Seg., to 30 days. N.Y. Comp. Codes R. & Regs. tit. 7, § 270.2;4. Plaintiff "was in solitary for 2,387 days—more than 79 times longer than the guidelines sentence." (Pltf.'s Opp. at 8. (emphasis omitted).) A reasonable jury could therefore find that Plaintiff's lengthy confinement was "grossly disproportionate" to the reasons for the isolation. *Peoples*, 898 F. Supp. 2d at 621. "[E]ven if Plaintiff's past violent behavior provides a possible penological justification, there is a point at which circumstances (i.e., the amount of time in Ad. Seg. and the inmate's behavior during that time) reasonably suggest that such justification is no

longer legitimate." *H'Shaka*, 444 F. Supp. at 380. Accordingly, if Plaintiff's continued confinement in Ad. Seg. was based on past violent conduct alone and Defendants failed to take into account the lack of more-recent serious disciplinary infractions, Plaintiff could succeed on his Eighth Amendment claim.

Regarding the Subjective Test, as discussed earlier in this opinion, there is a genuine dispute of material fact regarding whether the Defendants were relying solely on Plaintiff's past conduct when deciding to hold him in Ad. Seg. As a result, there is also a genuine dispute of material fact as to whether the Defendants had a legitimate penological justification for holding Plaintiff in Ad. Seg. for the purposes of the Eighth Amendment. *See id.* Plaintiff's Eighth Amendment claim is thus "intertwined with his procedural due process claims"—in other words, if Defendants failed to provide meaningful review of Plaintiff's status for more than six years and instead retained him in solitary "for solely punitive reasons, his right to due process and his right to be free from cruel and unusual punishment are both implicated." *Smith v. Annucci*, No. 6:18-CV-06261 EAW, 2019 WL 539935, at *7 (W.D.N.Y. Feb. 11, 2019). Conversely, if Defendants meaningfully reviewed Plaintiff's continued confinement and "reached the conclusion that Plaintiff [could not] be released from administrative segregation for reasons of institutional safety, Plaintiff cannot succeed on either of his claims." *Id.* Plaintiff's Eighth Amendment claim therefore turns on an unresolved question of fact – namely, whether the Defendants have put forth a sufficient penological justification for Plaintiff's years-long confinement. As a result, Defendants' motion for summary judgment as to this claim is denied.

## V.     Retaliation

Plaintiff claims that Defendants Griffin and Demo violated his First and Fourteenth Amendment rights by transferring him to a different facility and subjecting him to indefinite

solitary confinement in retaliation for raising grievances as a member of the ILC. (Pltf.'s Opp. at 15.) Defendants dispute their involvement in the actions taken against Plaintiff, and, alternatively, argue that DOCCS had a legitimate basis to put Plaintiff in solitary confinement. (Defs.' MOL at 22-23.) Defendants seek summary judgment on Plaintiff's First and Fourteenth Amendment claim for retaliation. (*Id.* at 23.) Plaintiff opposes, contending that "Defendants' assertions are not undisputed, and even if DOCCS did have a legitimate penological basis to confine [Plaintiff], that would not necessarily rule out unlawful retaliation." (Pltf's Opp. at 15.)

To prevail on a retaliation claim, an inmate must show first that he engaged in (1) constitutionally protected conduct, (2) that prison officials took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action such that the protected conduct was a substantial or motivating factor for the adverse action. *See Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009). Regarding the second prong of the *Espinal* test, "[w]hile...the scope of conduct that can constitute actionable retaliation in the prison setting it is broad, it is not true that every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim." *Dawes v. Walker* 239 F.3d 489, 492-93 (2d Cir. 2001), *overruled on other grounds by Swierkiewciz v. Sorema N.A.*, 534 U.S. 506, 508 (2002). Rather, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Id*. at 493. Regarding the third prong of the *Espinal* test, several factors may be used to determine whether a causal connection exists, including: "(1) the temporal proximity between the plaintiff's protected activity and the defendant's adverse action, (2) the prior disciplinary record of the inmate, (3) the outcomes of any hearings regarding the allegedly retaliatory charges, and (4) any statements defendant makes concerning his motive." *Davidson v.*

*Bartholome*, 460 F. Supp. 2d 436, 444 (S.D.N.Y. 2006) (citation omitted). Finally, "circumstantial evidence alone can be sufficient to meet th[e] burden of proof" for a retaliation claim. *Rodriguez v. McClenning*, 399 F. Supp. 2d 228, 236 (S.D.N.Y. Apr. 22, 2005).

Defendants do not dispute that Plaintiff can meet the first prong of the *Espinal* test – namely, that Plaintiff engaged in constitutionally protected conduct by raising inmate grievances through his role on the ILC. (*See* Defs.' MOL at 22.) The Second Circuit has specifically found that "retaliation against a prisoner for filing or voicing grievances on behalf of a prison population as a member of an inmate grievance body, such as the ILC, 'violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments.'" *Dolan v. Connolly*, 794 F.3d 290, 294–95 (2d Cir. 2015) (quoting *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996)); *see also Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988) ("The right to petition government for redress of grievances—in both judicial *and* administrative forums—is 'among the most precious of the liberties safeguarded by the Bill of Rights.'") (quoting *United Mine Workers v. Illinois State Bar Ass'n*, 389 U.S. 217, 222 (1967) (emphasis in original)). Plaintiff's claimed conduct is therefore clearly a protected right of redress under the First and Fourteenth Amendments, and he has met the first prong of the *Espinal* test.

The Court finds that Plaintiff has also presented sufficient evidence to demonstrate adverse action, satisfying the second prong of the *Espinal* test. The Second Circuit and lower courts therein have consistently found that being placed in segregated confinement, as Plaintiff undisputedly was for over six years, is a form of adverse action. *See Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) (finding that a false misbehavior report that resulted in the plaintiff's placement in keeplock confinement constituted adverse action); *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) ("An allegation that a prison official filed false disciplinary charges in

retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under § 1983."); *Flood v. Cappelli*, No. 18-CV-3897 (KMK), 2019 WL 3778736, at *7 (S.D.N.Y. Aug. 12, 2019) (holding that placing plaintiff in keeplock confinement for six days constituted an adverse action); *Lugo v. Van Orden*, No. 07-CV-879, 2008 WL 2884925, at *4–5 (S.D.N.Y. July 23, 2008) (assuming that placing plaintiff in keeplock confinement for five days constitutes an adverse action and even "less adverse" action such as being moved to a different housing unit have been held to be sufficient to state a claim for retaliation).

That Defendants contest the reason why Plaintiff was investigated and placed in the Ad. Seg. does not alter this analysis. (*See* Defs.' MOL at 22-23; Defs.' Reply at 30-31.) All that is required to meet this prong at this stage is sufficient evidence demonstrating that Defendants' investigation and subsequent placement of Plaintiff into Ad. Seg. is the type of conduct "that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights," *Dawes*, 239 F.3d at 493. Plaintiff has done so. Defendants' only response is to deny having played a role in making the determination to issue the Adm. Seg. Recommendation (*see* Griffin Decl. ¶ 42; Demo Decl. ¶ 14), or investigate and place Plaintiff in Ad. Seg. on the basis of unreliable evidence (*see* Demo. Decl. ¶¶ 9-19). But because Plaintiff disputes these determinations, (*see* Pltf.'s 56.1 ¶¶ 28-38; 41-49), this is precisely the sort of factual dispute that cannot be resolved at summary judgment. *See Graham v. Henderson,* 89 F.3d 75, 80–81 (2d Cir. 1996) (reversing district court's grant of summary judgment where inmate "succeed[ed] in creating a genuine issue of fact over whether he was, as he claim[ed], collecting names of possible representatives in the grievance process, or, as the defendants argue[d], circulating a petition and organizing a work slowdown).

Finally, the Court holds that Plaintiff has demonstrated a genuine issue of material fact as to the third prong of the *Espinal* test – namely, that the protected conduct was a substantial or motivating factor in the Defendants' decision to investigate and place Plaintiff in solitary. First, the temporal proximity between Plaintiff's advocacy as part of the ILC and the adverse action of placing him in solitary confinement is circumstantial evidence of a retaliatory motive on the part of Defendants. *See Washington v. Afify*, 681 F. App'x 43, 46 (2d Cir. 2017) (finding that temporal proximity between filing of inmate grievance and allegedly false misbehavior report was circumstantial evidence of retaliation); *Espinal*, 558 F.3d 119, 129 (2d Cir. 2009) (denying summary judgment given "the passage of only six months between the dismissal of Espinal's lawsuit and an allegedly retaliatory beating"). Defendants placed Plaintiff in Ad. Seg. approximately one month after "the ILC's requests that issues be escalated to the HUB Superintendent and Commissioner (on March 16, 2015 and April 9, 2015, respectively)." (Pltf.'s Opp. at 17.)

Second, and perhaps more compelling, Plaintiff has proffered direct evidence of retaliatory animus. Plaintiff contends that Defendant Griffin threatened him in the package room for raising issues on behalf of the ILC (Pltf.'s 56.1 ¶¶ 18-20; Booker Decl. ¶¶ 44-47), in advance of instigating an investigation against him based on allegedly false information (Pltf.'s 56.1 ¶¶ 21-27). Defendant's Griffin's purported actions suggest retaliatory intent. *See Washington*, 681 F. App'x at 46 (reversing grant of summary judgment on retaliation claim where inmate alleged that correction officers confronted him directly about his practice of filing grievances before they issued an allegedly false misbehavior report against him) (summary order). The Court is aware that the parties offer conflicting testimony as to what prompted the investigation into Plaintiff and his subsequent placement in the Ad. Seg. Defendants insist that they investigated Plaintiff

based on credible information that he was organizing an unlawful Demonstration at Green Haven, not in response to his advocacy on the ILC. (Defs.' MOL at 22-23.) Plaintiff, by contrast, denies there being any legitimate evidence of his involvement in a purported Demonstration. (Pltf.'s Opp. at 18-19.) If a trier of fact were to conclude that Plaintiff is telling the truth, then the Defendants are lying about the reasons for launching the investigation and placing Plaintiff in solitary. Accordingly, "[a] false reason for the [investigation and placement] would support the inference that the real reason was the improper one: retaliation." *Gayle*, 313 F.3d at 683 (denying summary judgment where fact issue existed as to whether retaliation was substantial factor in officials' decision to charge and punish prisoner); *see also Fann v. Graham*, No. 915CV1339DNHCFH, 2018 WL 1399331, at *9 (N.D.N.Y. Jan. 11, 2018) (same), *report and recommendation adopted*, No. 915CV1339DNHCFH, 2018 WL 1399340 (N.D.N.Y. Mar. 19, 2018). If true, the facts as Plaintiff alleges—namely, that he was not organizing any demonstration—suggest that the Defendants disciplined him because of his leadership on the ILC. Because a genuine issue of material fact exists with regard to Defendants' retaliatory intent, the Court denies summary judgment as to Plaintiff's First Amendment claim.

## VI.    Injunctive Relief

Plaintiff brings multiple claims for injunctive relief, including (1) changes to Ad. Seg. procedures, (2) his return to general population, (3) the restoration of his property, (4) the reversal and expungement of his institutional records, and (5) prohibiting Defendants from retaliating against him (*see* ECF No. 228, at Request for Relief), all of which Defendants contend must be dismissed because he "has returned to general population," (Defs.' MOL at 23). Plaintiff disagrees and asserts that he is entitled to trial on his injunctive relief claims. (Pltf.'s Opp. at 19.)

The Court agrees with Defendants that Plaintiff's release from Ad. Seg. moots his second request. The Second Circuit has held that an inmate's claim for injunctive relief from solitary confinement is moot once the period of confinement has lapsed. *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir. 1985) (per curiam); *see also Martin-Trigona v. Shiff*, 702 F.2d 380, 386 (2d Cir. 1983) ("The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed"). Plaintiff's release from Ad. Seg. likewise renders his first request for changes to Ad. Seg. procedures moot. "Once the conduct of which a prisoner complains is no longer directed at that prisoner, a prisoner's personal claim for injunctive relief from that conduct is moot." *Clarkson v. Coughlin*, 783 F. Supp. 789, 794–95 (S.D.N.Y. 1992). This Court has previously found moot a plaintiff's request for a declaration that DOCCS's treatment of deaf and hearing-impaired inmates is unlawful, and an injunction against the officials them to provide the requested services for the same reason. *See id.*

Because all Defendants have retired from DOCCS, Plaintiff's fifth request is also moot. (*See* Defs.' 56.1 ¶¶ 3-7.) "A case is deemed moot where the problem sought to be remedied has ceased, and where there is no reasonable expectation that the wrong will be repeated." *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (per curiam) (quoting *Preiser v. Newkirk,* 422 U.S.

395, 402 (1975) (quotation marks omitted)). Defendants are no longer DOCCS employees and therefore cannot retaliate against Plaintiff or re-place him in Ad Seg.

To the extent that Plaintiff's property has not been returned to him as part of his release from Ad. Seg., his third request for injunctive relief survives. Next, because inaccuracies in his institutional records may cause him harm in the future, Plaintiff's fourth request for reversal and expungement also survives. Finally, Defendants did not address why Plaintiff's third or fourth requests for relief should be dismissed in either their moving or reply papers. The Court thus deems any arguments against them abandoned. *See Jackson*, 766 F.3d at 198.

Accordingly, the Court grants partial summary judgment to Defendants on the issue of injunctive relief.

## VII.    Eleventh Amendment Damages

Defendants contend that the Eleventh Amendment bars Plaintiff's damages claims against Defendants in their official capacity. (Defs.' MOL at 28) (citing *Seminole Tribe of Fla.*, 517 U.S. 44, 73 (1996).) Defendants are correct that sovereign immunity bars suit against a state official sued in his official capacity, unless Congress has abrogated that immunity or the state has consented to suit. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 & n.9 (1984). Plaintiff counters, however, that he has sued each Defendant in his individual *and* his official capacity. (Pltf.'s Opp. at 22.) The Eleventh Amendment does not bar a federal court from granting monetary relief against state officials sued in their individual capacities. *Williams v. Marinelli,* 987 F.3d 188, 197 (2d Cir. 2021) (citing *Hafer v. Melo*, 502 U.S. 21, 31 (1991)). Accordingly, Plaintiff can seek damages from Defendants in their individual capacity, and Defendants' motion on this issue is denied.

## CONCLUSION

Defendants' motion for summary judgment is DENIED in part and GRANTED in part. The Court awards Defendants partial summary judgment on Plaintiff's request for injunctive relief. Defendants' motion for summary judgment is DENIED in all other respects.

Plaintiff's motion for partial summary judgment is DENIED in part and GRANTED in part. The Court awards Plaintiff summary judgment on his Fourteenth Amendment due process claim in connection with the Hearing, and on Defendants' affirmative defenses of qualified immunity and exhaustion. Plaintiff's motion for partial summary judgment is DENIED in all other respects.

A telephonic Pretrial Conference is scheduled for March 28, 2024 at 12 pm. To access the teleconference, please follow these directions: (1) Dial the Meeting Number: (877) 336-1839; (2) Enter the Access Code: 1231334 #; (3) Press pound (#) to enter the teleconference as a guest. The Clerk of Court is directed to terminate the motions at ECF Nos. 279 and 289.

Dated: February 23, 2024                        SO ORDERED:
White Plains, New York

                                NELSON S. ROMÁN
                                United States District Judge